562 F.3d 1249 (2009)
HYDRO RESOURCES, INC., Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Navajo Nation, Intervenor,
State of New Mexico; National Mining Association, Amici Curiae.
No. 07-9506.
United States Court of Appeals, Tenth Circuit.
April 17, 2009.
*1253 Marc D. Flink (Benjamin D. Pergament, Baker & Hostetler LLP, Denver, CO & Jon J. Indall, Comeau, Maldegen, Templeman & Indall, LLP, Santa Fe, NM, with him on the briefs) Baker & Hostetler LLP, Denver, CO, for Petitioner.
David A. Carson (Ronald J. Tenpas & John C. Cruden, with him on the briefs), U.S. Department of Justice, Environment & Natural Resources Division, Denver, CO, for Respondent.
Paul E. Frye (Louis Denetsosie, Attorney General, Navajo Nation Department of Justice, Window Rock, AZ & Jill E. Grant, Nordhaus Law Firm, LLP, Washington, DC, with him on the briefs), Frye Law Firm, P.C., Albuquerque, NM, for Intervenor.
Gary K. King, Attorney General, Christopher D. Coppin, Assistant Attorney General, Albuquerque, New Mexico, and Hilary C. Tompkins, Office of the Governor, Santa Fe, New Mexico, filed an Amicus Curiae brief for the State of New Mexico.
Anthony J. Thompson and Christopher S. Pugsley, Thompson & Simmons, PLLC, Washington, D.C., filed an Amicus Curiae brief for National Mining Association in support of Petitioner.
Before LUCERO and EBEL, Circuit Judges, and FRIZZELL,[*] District Judge.
EBEL, Circuit Judge.
Petitioner Hydro Resources, Inc. ("HRI") challenges a February 6, 2007, U.S. Environmental Protection Agency ("EPA") Land Status Determination, in which EPA concluded that certain land owned by HRI in the "checkerboard" area of northwestern New Mexicothe so-called "Section 8" landis "Indian country." EPA's Determination subjects HRI's proposed uranium mine to EPA regulation under the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f-300j(26), rather than regulation by the New Mexico Environmental Department ("NMED").
EPA's regulations implementing the SDWA define Indian lands by reference to 18 U.S.C. § 1151. That section defines "Indian country" as (1) reservations, id. § 1151(a), (2) "dependent Indian communities," id. § 1151(b), and (3) allotments, id. *1254 § 1151(c).[1] The pertinent provision here is § 1151(b). After a notice and comment period and consultations with the Department of the Interior ("DOI") and the Navajo Nation, EPA determined that the Section 8 land is located within a dependent Indian community. Under our precedents, we agree with EPA's conclusion and, accordingly, we deny HRI's petition.

I. BACKGROUND

A. The Section 8 Land and the "Checkerboard"
HRI, a non-Indian mining corporation, intends to operate a uranium mine in McKinley County, New Mexico. See HRI, Inc. v. EPA, 198 F.3d 1224, 1231 (10th Cir.2000).[2] Specifically, HRI seeks to mine within the confines of 160 acres of land that it owns in fee in the southeast portion of Section 8, Township 16N, Range 16W. Id. HRI acquired the land from United Nuclear Corporation ("UNC"), which had purchased the land from the United States in 1970; HRI also purchased, at that time, UNC's patents for uranium-mining claims on the Section 8 land. The United States owns in fee simple the remainder of Section 8. Id.
No one lives on the Section 8 land. Gallup, the largest city in McKinley County, lies approximately 11 miles southwest of the Section 8 land, while the Navajo town of Church Rock lies approximately 6 miles south of the land. HRI pays annual property taxes on the Section 8 land to McKinley County. New Mexico maintains the only access road to Section 8, State Highway 566, while McKinley County shares responsibility with the federal government for the other roads in the area. McKinley County also provides fire, police, emergency, and school services to those living in the surrounding area. Meanwhile, should HRI's uranium operations ever begin, Public Service Company of New Mexico will provide electricity, and the New Mexico State Water Engineer has approved HRI's request for water rights.
Section 8 is located in the checkerboard area of northwestern New Mexico, where federal land grants created a "pattern of mixed Indian and non-Indian land title." HRI, 198 F.3d at 1231.[3] The Section 8 *1255 land is located near, but not within, the Navajo reservation. Instead, it is within the jurisdiction of the Eastern Navajo Agency and the geographic bounds of the Church Rock Chapter (the "Chapter") of the Navajo Nation.[4]
The area surrounding Section 8 is "often referred to as the `EO 709/744 area' because of its establishment as an Indian reservation under two executive orders bearing those numbers" which were issued in 1907 and 1908. Id. Just a few years later, however, those two executive orders were superseded by two additional executive orders "which restored unalloted lands [in that particular tract] to the public domain." Id. The latter executive orders thereby terminated the reservation status of the "EO 709/744" tract. See Pittsburg & Midway Coal Mining Co. v. Yazzie ("Yazzie"), 909 F.2d 1387, 1419 (10th Cir. 1990). In Yazzie, this court concluded that the entire EO 709/744 area was not a de facto reservation and recognized the complicated jurisdictional status of the checkerboard lands. Id. at 1421. Thereafter, in Pittsburg & Midway Coal Mining Co. v. Watchman ("Watchman"), 52 F.3d 1531, 1542-45 (10th Cir.1995), abrogated in part on other grounds by Alaska v. Native Village of Venetie Tribal Government, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998), this court entertained the possibility that land in the checkerboard could constitute a "dependent Indian community" under 18 U.S.C. § 1151(b).

B. The Church Rock Chapter
As noted above, the Section 8 land falls within the bounds of the Church Rock Chapter. The Chapter is a local government organization of the Navajo Nation, authorized by the Navajo Nation Local Governance Act, see 26 N.N.C. § 1, to provide "for the general health, safety and welfare of the Chapter membership," id. § 2.22. The Navajo Nation officially certified the Chapter on December 5, 1955.
The bounds of the Chapter encircle a land base of over 57,000 acres, 78% of which is held in trust for the Navajo or individual Navajos by the BIA. The lands which the BIA holds in trust were originally purchased by the United States from the Santa Fe Railroad Company for the Navajo tribe or for individual Navajo allottees pursuant to the Act of 1928. Around 10% of the Chapter land is held by the Bureau of Land Management ("BLM") (and used almost exclusively by Navajos), 6% is privately owned, and 2% is owned in fee by the Navajo Nation.
While the Section 8 land has no inhabitants, members of the Chapter live in adjacent areas. The Chapter's social and political nerve center, the Chapter House, "is located about three miles east of the city limits of Gallup" (R. doc. 1 at 9) and approximately six miles south of the Section 8 land. A Head Start center, elementary school, several churches, and various other buildings housing Chapter, tribal, and BIA entities surround the Chapter House. These facilities serve the 2,800 or so (according to 2000 U.S. Census data) inhabitants of the Chapter's land. Over 97% of those inhabitants are Navajos; most of the non-Indians living on the Chapter land are married to Navajos. A majority of the inhabitants speak Navajo. Primarily, the Chapter's residents raise livestock as a livelihood. Many supplement their income *1256 with earnings from "traditional self-employment: jewelry making, silversmithing, sewing, stone carving, wood carving, and weaving." (R. doc. 44 at 9.) Some Chapter residents commute to Gallup for work.
"Neither the unincorporated Churchrock Chapter nor the Navajo tribal government provides any infrastructure or basic services to Section 8." (R. doc. 4 at 2; see also doc. 6 at 2.) However, the Navajo Nation provides a variety of services to the residents of the Church Rock Chapter. For example, the Nation polices the Chapter, although the Chapter makes up its own Navajo judicial district. The Navajo Nation also provides electricity, drinking water, wastewater treatment, and other utilities. The federal government complements these services, providing social services, natural resource management, grazing management and permitting, housing development, health services, economic development grants, law enforcement improvement grants, and education programs. Additionally, the Chapter itself also offers some services to its residents. The State of New Mexico services the main road through the Chapter and buses some Chapter students to school in Gallup. Public Service Company of New Mexico provides natural gas to Chapter residents.

C. The Safe Drinking Water Act
The SDWA, 42 U.S.C. §§ 300f-300j(26), establishes nationwide minimum drinking water protection standards. See H.R.Rep. No. 93-1185, at 1-2 (1974), reprinted in 1974 U.S.C.C.A.N. 6454, 6454-55; see also HRI, 198 F.3d at 1232. Those standards are implemented by EPA, which in many instances delegates certain regulatory prerogatives to states and Indian tribes. See HRI, 198 F.3d at 1232; see generally 42 U.S.C. §§ 300g-1 & 300h-1.[5] As part of the SDWA, Congress instructed EPA to prescribe an underground injection control ("UIC")[6] program for all lands in the United States, including Indian lands, in order "to prevent underground injection which endangers drinking water sources." 42 U.S.C. § 300h(b)(1).
By statutory default, EPA typically has primary enforcement responsibilities for lands that fall within 40 C.F.R. § 144.3's definition of "Indian lands" until a tribe has secured "Treatment as a State" ("TAS") status and primacy over its lands. That regulation, 40 C.F.R. § 144.3, states that "Indian lands" means "`Indian country' as defined in 18 U.S.C. 1151." Where a dispute exists as to the "Indian country" *1257 status of land, EPA administers the UIC program until a final determination can be made. See 53 Fed.Reg. 43096, 43097 (Oct. 25, 1988);[7]see also HRI, 198 F.3d at 1233. Accordingly, EPA administers the UIC program for Indian lands in New Mexico, with the exception of those lands under the purview of tribes that have secured TAS status and primacy. See HRI, 198 F.3d at 1232; 40 C.F.R. 147.1603 ("The UIC program for all classes of wells on Indian lands in New Mexico . . . is administered by EPA."). Meanwhile, EPA has approved New Mexico's UIC program; hence, elsewhere in the State of New Mexico, NMED regulates the type of UIC wells that HRI seeks to operate here. See 40 C.F.R. §§ 147.1600-147.1601; see also 48 Fed.Reg. 31640 (July 11, 1983).

D. Regulation of the Section 8 Land Under the SDWA
Although EPA approved the Navajo Nation for TAS and for primacy in 1994, see HRI, 198 F.3d at 1232-33, the two UIC programs at issue here are the EPA-administered program for Indian lands in New Mexico, see 40 C.F.R. § 147.1603, and the NMED program, see id. § § 147.1600-147.1601.[8] In approving New Mexico's SDWA application for primacy, EPA recognized the geographic reach of the NMED UIC program to be statewide, except as to Indian lands. See 48 Fed.Reg. at 31640. This exception to the geographic reach of the NMED UIC program led to the dispute here, which is now in its second stage.
The first stage of the dispute stemmed from EPA's decision that the jurisdictional status of the Section 8 land was in dispute. Prior to that decision, the NMED had already approved HRI's request for a UIC permit for the Section 8 land in 1989. But the Navajo Nation submitted a letter in October 1996 to EPA, asserting that Section 8 was located within "Indian country" and thus fell outside the bounds of NMED's regulatory jurisdiction. EPA, in turn, requested additional information about the jurisdictional issue from both the NMED and the Navajo Nation. In the meantime, however, EPA stated that it had "determined that a dispute exists regarding the Indian country status of Section 8, and, therefore, HRI must obtain its federal SDWA permit for Section 8 from EPA as well." (R. doc. 13b at 96.) HRI and NMED appealed that determination to this court.[9]
*1258 On appeal, this court concluded that EPA had not erred in finding "a legitimate dispute as to the jurisdictional status of the lands in question." HRI, 198 F.3d at 1244. The court remanded the issue to EPA "for a final determination as to whether [the Section 8] land is a dependent Indian community under 18 U.S.C. § 1151(b)." Id. at 1254.
On remand, EPA issued a notice inviting public commentary on the issue. The small pool of comments revealed a variety of interests in both the jurisdictional issue and the broader issue of uranium mining near Navajo communities. EPA also consulted with the Navajo Nation.
Additionally, EPA sought the input of the DOI's Solicitor, summing up the question as follows: "As framed by [the Tenth Circuit], the precise issue for EPA in determining the status of HRI's land in Section 8, is whether the land is, or is part of, a `dependent Indian community' as defined under 18 U.S.C. § 1151(b)." (R. doc. 47 at 2.) On November 3, 2006, the DOI Solicitor submitted its statement on the question ("DOI Opinion"). The Opinion concluded that the Section 8 land fell within the encincture of § 1151(b) because of the land's ties to the Church Rock Chapter community.
After further analysis and investigation, EPA issued its Land Status Determination on February 6, 2007. The Determination reiterated much of the reasoning of the DOI Opinion. EPA ultimately concluded that "the Church Rock Chapter, which necessarily includes Section 8, is a `dependent Indian community.'" (R. doc. 44 at 13.) Accordingly, the "EPA is the proper authority under the SDWA to regulate underground injections on HRI's Section 8 land." (Id.) HRI petitioned this court to review EPA's Determination.

II. DISCUSSION

A. Jurisdiction
This court has jurisdiction to review the EPA's final decision under 42 U.S.C. § 300j-7(a)(2). The EPA, however, challenges HRI's Article III standing to seek review of the Determination before this court. EPA reasons that because the Land Status Determination merely implicates which regulator (EPA or NMED) will enforce UIC regulations rather than what those regulations will be, HRI has suffered no harm; that is, because one of these two agencies will enforce the UIC regulations, it should not matter to HRI which of the two agencies it will be. However, we conclude that because "HRI must now obtain a permit from EPA prior to commencing underground injection on Section 8," HRI, 198 F.3d at 1237, after already obtaining a permit from New Mexico, HRI will almost certainly incur additional expenses if EPA, in fact, has properly asserted jurisdiction over Section 8. Therefore, we conclude that HRI has standing.[10]
To have Article III standing, "a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." Massachusetts v. EPA, 549 U.S. 497, 517, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, *1259 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Standing must be established even though the SDWA provides an expansive avenue for petitions for review. See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 487 n. 24, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("Neither the Administrative Procedure Act, nor any other congressional enactment, can lower the threshold requirements of standing under Art. III."); see also Am. Forest & Paper Ass'n v. U.S. EPA, 154 F.3d 1155, 1158 (10th Cir.1998).
Here, only the "injury in fact" element is in dispute. The issue is whether HRI has suffered "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560, 112 S.Ct. 2130 (quotations, citations omitted). HRI argues that the EPA Determination burdens HRI with the "cost of compliance with Federal regulations" and "prohibits HRI from renewing its UIC permit previously obtained from the State." (Pet'r Reply at 7, 8.) In other words, to proceed with its mining plans, HRI must expend the funds necessary to comply with the federal UIC regime.
We determine that the outlay of funds necessary to secure a UIC permit under the EPA-administered program constitutes an injury in fact. See Nat'l Collegiate Athletic Ass'n v. Califano, 622 F.2d 1382, 1386 (10th Cir.1980) ("[O]ut-of-pocket cost to a business of obeying a new rule of government, or the unwanted result of the government rule whether or not [there was an associated] pecuniary loss" suffices as an "injury in fact." (citation omitted)). EPA has acknowledged "that requiring a federal permit for Section 8 will be disruptive to some degree, especially since NMED and HRI have assumed until recently that the NMED-issued permit would be effective. . . ." (R. doc. 13b at 97.) In addition to being disruptive, the permitting process could well be very expensive, inflicting an economic injury that surely confers standing on HRI. See Califano, 622 F.2d at 1389 ("[T]he cost of obeying the regulations constitutes injury."); see also Sac & Fox Nation of Mo. v. Pierce, 213 F.3d 566, 573 (10th Cir.2000) (allegations of "particularized imminent economic injury" suffice for "injury in fact" element). Thus, HRI has standing to pursue review in this court and we may exercise jurisdiction under 42 U.S.C. § 300j-7(a)(2).

B. Standard of Review
EPA's determination that the Section 8 land is part of a dependent Indian community under § 1151(b) constitutes a determination that EPA has jurisdiction, under the SDWA, to regulate underground injections on that land.[11] Therefore, we review the Land Status Determination "`to ascertain whether the [jurisdictional] decision has an adequate basis in law.'" City of Fort Morgan v. Fed. Energy Regulatory Comm'n, 181 F.3d 1155, 1159 (10th Cir.1999) (quoting Cascade Natural Gas Corp. v. Fed. Energy Regulatory Comm'n, 955 F.2d 1412, 1415 (10th Cir.1992) (further quotation omitted)). In our analysis of EPA's jurisdictional determination, "we are under no obligation to defer to the agency's legal conclusions." Id. (quotation omitted). See also Tulengkey v. Gonzales, 425 F.3d 1277, 1280 (10th Cir.2005) (explaining *1260 that this court reviews an agency's legal conclusions de novo).
Even if Chevron deference does broadly apply to agencies' interpretations of their own jurisdiction and authority, such deference would not be appropriate in this case. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "In Chevron, [the Supreme Court] held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (emphasis added). Here, Congress has delegated to EPA the authority to administer the SDWA; it has never delegated to EPA the authority to administer § 1151. Cf. Kansas v. United States, 249 F.3d 1213, 1218-21, 1228-29 (10th Cir.2001) (applying Chevron to the National Indian Gaming Commission's interpretation of the term "Indian lands" within the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2702-2721, a statute the agency was charged with administering).
Furthermore, while EPA's determination of Section 8's land status involved an interpretation of one of its own regulations rather than of statutory language in the SDWA, courts do not defer to agency interpretations of regulations that merely "restate the terms of [a] statute." Gonzales v. Oregon, 546 U.S. 243, 257, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006). "[T]he existence of [such] a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute." Id.
Thus, in ascertaining here whether the Land Status Determination "has an adequate basis in law," City of Fort Morgan, 181 F.3d at 1159, we do not defer to EPA's legal conclusions as to the Indian country status of the Section 8 land. See HRI, 198 F.3d at 1236 (noting that the agency's "jurisdiction under federal Indian law" presents a "purely legal issue[ ]"). We examine "an agency's factual findings to see if they are supported by reasonable, substantial and probative evidence considering the record as a whole." Turgerel v. Mukasey, 513 F.3d 1202, 1205 (10th Cir. 2008) (quotation omitted). See also Quivira Mining Co. v. U.S. EPA, 765 F.2d 126, 128 (10th Cir.1985) (applying the substantial evidence test to agency "determinations of fact [that] are `jurisdictional'").

C. Merits
EPA regulations promulgated under the SDWA define "Indian lands" as "`Indian country' as defined in 18 U.S.C. 1151." 40 C.F.R. § 144.3. The parties agree that only § 1151(b) is pertinent. Therefore, the central issue here is whether EPA's Land Status Determinationthe agency's conclusion that the Section 8 land is within a dependent Indian community as defined in § 1151(b)[12]has "an adequate basis in law," City of Fort Morgan, 181 F.3d at 1159.
*1261 Section 1151(b) defines Indian country as "all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state." 18 U.S.C. § 1151(b) (emphasis added). In Alaska v. Native Village of Venetie Tribal Government ("Venetie"), 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998), the Supreme Court determined that the term "dependent Indian communities"
refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements  first, they must have been set aside by the Federal Government for use of the Indians as Indian land; second, they must be under federal superintendence.

522 U.S. at 527, 118 S.Ct. 948 (emphasis added).[13] The first "requirement guarantees that the land is actually occupied by an Indian community," while the second "ensures that the community is dependent on the federal government such that the federal government and the Indians, rather than the states, exercise primary jurisdiction." United States v. Arrieta, 436 F.3d 1246, 1250 (10th Cir.2006).
Before reaching the two Venetie requirements, however, our precedents compel us to identify the appropriate "community of reference." See HRI, 198 F.3d at 1248 ("[N]othing in Venetie speaks to the propriety of the first element of [the Watchman] test  determination of the proper community of reference.").
The Watchman test adopted in the Tenth Circuit involved two inquiries. First, the court identified the appropriate community of reference. 52 F.3d at 1543-44. Second, the court used four factors to determine whether that community of reference "constitutes a dependent Indian community under 18 U.S.C. § 1151(b)." Id. at 1545. Those factors included
(1) whether the United States has retained "title to the lands which it permits the Indians to occupy" and "authority to enact regulations and protective laws respecting this territory,"; (2) "the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area,"; (3) whether there is "an element of cohesiveness... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality,"; and (4) "whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples."
Watchman, 52 F.3d at 1545 (quoting United States v. South Dakota, 665 F.2d 837, 839 (8th Cir.1981)).
Although Venetie abrogated a Ninth Circuit test that embraced many of the same factors that are part of the Watchman test, the HRI court subsequently concluded that Venetie could not have abrogated Watchman's threshold "community of reference" prong because the Venetie Court "was not even presented with the question of defining the proper means of determining a community of reference for analysis under § 1151(b)." HRI, 198 F.3d *1262 at 1249. Thus, the HRI court noted that it was bound to apply Watchman's community of reference test absent en banc review. Id.
The HRI court acknowledged, however, that Venetie had altered the second step of the Watchman inquiry. 198 F.3d at 1248; see also Arrieta, 436 F.3d at 1250 n. 2. With the exception of the third Watchman factor  "an element of cohesiveness"  those factors approximate the set-aside and superintendence requirements set forth in Venetie. Thus, we first determine the community of reference, and we then apply to that community of reference the set-aside and superintendence requirements established in Venetie to determine whether that area is a dependent Indian community. See HRI, 198 F.3d at 1248; Arrieta, 436 F.3d at 1250.[14]
To determine the appropriate community of reference, we follow the same general three-step procedure we developed before Venetie. First, we identify "the geographical definition of the area proposed as a community." United States v. Adair, 111 F.3d 770, 774 (10th Cir.1997); id. at 774 n. 5 ("Generally, cases which result in dependent Indian community designation are areas exhibiting reasonably distinct boundaries."). Second, we analyze "`the status of the area in question as a community.'" Id. at 774 (quoting Watchman, 52 F.3d at 1543). Lastly, we consider "that locale or `community of reference within the context of the surrounding area.'" Id. (quoting Watchman, 52 F.3d at 1543-44).
HRI stridently disputes that Watchman's "community of reference" test survived Venetie. However, as the first HRI panel noted, HRI and Arrieta, both decided after Venetie, determined that our "community of reference" test survived Venetie. Therefore, Tenth Circuit law on this matter is settled. See United States v. Meyers, 200 F.3d 715, 720 (10th Cir. 2000) ("doctrine of stare decisis" bars panel from overruling earlier decision of a panel of this court "absent en banc reconsideration or a superseding contrary decision by the Supreme Court" (quotation omitted)).

1. Community of Reference
EPA recognized that this circuit's precedents require that before reaching the two *1263 Venetie prongs, the reviewing court or agency determine the appropriate community of reference. Having considered the three steps of the community of reference analysis, EPA concluded that the appropriate community of reference was the Church Rock Chapter. We see no reason to reject this conclusion.
First, we agree with EPA's finding that the Chapter has definite geographic boundaries. EPA included in the administrative record a map showing the contours of the Chapter. As EPA determined, the Section 8 land that HRI seeks to mine falls within these bounds.
Second, we consider whether EPA properly determined that the Chapter is a "community" under our caselaw. This factor evaluates "the existence of an element of cohesiveness" in the community. Watchman, 52 F.3d at 1544. Cohesiveness "can be manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality." Id.
The Chapter exhibits several of the indicia of a cohesive community that we have looked for in past cases. Demographically, the population is fairly homogenous: based on the most current U.S. Census data, 97% of the Chapter's population are members of the Navajo Nation and the majority of the residents speak Navajo or other native languages. This indicates the presence of common interests. Cf. United States v. M.C., 311 F.Supp.2d 1281, 1291 (D.N.M. 2004) ("[I]t is clear that a culturally cohesive community exists in the Iyanbito chapter [of the Navajo Nation] as a whole.").
Moreover, the community is cohesive in terms of its economic pursuits. In keeping with tradition, many of the Chapter's residents raise livestock and supplement their income with earnings from the sale of traditional crafts. Of course, other Chapter residents commute to Gallup for work, but the community remains centered on traditional means of earning a living. We note also that the Chapter, pursuant to its authority under the Navajo Local Government Act, addresses many of the health, welfare, and social needs of its residents. Compare Blatchford v. Sullivan, 904 F.2d 542, 549 (10th Cir.1990) (noting that Yah-Ta-Hey denizens' "eligibility for a variety of services flows ... by virtue of their identification as part of the Navajo Nation, not by virtue" of their settlement in Yah-Ta-Hey). As EPA correctly concluded, the Chapter has "cohesiveness" such that we can consider it a community.
At the third step, we scrutinize EPA's analysis of the Chapter "`within the context of the surrounding area.'" Adair, 111 F.3d at 774 (quoting Watchman, 52 F.3d at 1543-44). This inquiry ensures that we do not artificially fragment a larger community or fuse a series of smaller communities in identifying the appropriate community of reference. Thus, we ask whether the locality is a separate "mini-society consisting of personal residences and an infrastructure." Watchman, 52 F.3d at 1544; see also Adair, 111 F.3d at 775 (factoring in "paucity of institutions and services" available in area in question and the area's "generalized dependency on surrounding areas" in rejecting that area's status as a "community"). If an area "lacks the quality and quantity of activity and institutions which create infrastructure and, in turn, community," then we will not consider it a distinct community. Adair, 111 F.3d at 775. Nonetheless, "a community cannot be expected to originate all or even most of the `needs, necessities, and wants of modern life.'" Id. (quoting Watchman, 52 F.3d at 1544).
As to the Chapter's infrastructure, the DOI Opinion noted the fact that the Chapter *1264 has a collection of homes which are "either ... organized into traditional family-based `camps' of one to six homes or into low cost tribal housing developments." (R. doc. 44 at 21.) There are over 800 homes on the Chapter's land. Additionally, the Chapter "has a Head Start center, an elementary school, several churches, and a host of Chapter, tribal, and BIA services and facilities." (Id. at 9.) While the Chapter's infrastructure is not extensive, "a community cannot be expected to originate all or even most of the needs, necessities, and wants of modern life." Adair, 111 F.3d at 775 (quotation omitted). This is all the more so for rural communities like the Chapter.
EPA acknowledged that many of the Chapter's services are provided by the Navajo Nation, the state, or the federal government. Specifically, the Navajo Nation provides policing (although the Chapter makes up its own judicial district within the Nation), electricity, drinking water, wastewater treatment, and other utilities. Among other services, the federal government provides social services, natural resource management, grazing management and permitting, housing development, health services, economic development grants, law enforcement improvement grants, and education programs. And New Mexico services the main road through the Chapter, buses some Chapter students to school in Gallup, and also provides natural gas to the Chapter's residents.
Nevertheless, EPA determined that the Chapter possessed sufficient distinctness under Watchman. Three critical factors support that conclusion. First, we note (as did EPA and DOI) that the Chapter "is a Navajo traditional rural community." (R. doc. 44 at 9; see also id. at 21.) Self-sufficiency is not necessary for community status under our jurisprudence. That other entities provide the Chapter services is to be expected for a rural, economically disadvantaged community. Cf. Adair, 111 F.3d at 775.
Second, the Chapter is a distinct political entity under the Navajo Nation, which "performs similar functioning with respect to the health and welfare of its residents as those performed by a county or municipality in the state government system." (R. doc. 44 at 8) (quoting Thriftway Mktg. Corp. v. State, 111 N.M. 763, 810 P.2d 349, 352 (1990).) See 26 N.N.C. §§ 1 & 2.22 (authorizing Chapters to make decisions regarding local matters and provide for the health, safety and general welfare of their memberships). In this regard, the Chapter's residents turn to the Chapter  and particularly the Chapter House  to obtain services and to gather for social and political events. EPA found that 88% of the Chapter's residents visit the Chapter House  the community's social and political hub  and 98% of those residents do so at least monthly.
Third, under the Local Governance Act, the Chapter has developed a Chapter planning initiative and land use plan. The land use plan, issued in November 2002, provides further evidence that the community is distinct. The document captures the specific concerns and goals of the Chapter community in the context of a plan to add and update housing on Chapter land for Chapter residents. These factors are sufficient to distinguish the Chapter as a community distinct from both the Navajo Nation more broadly and the Gallup community. In sum, we cannot find fault with EPA's determination that the Church Rock Chapter is the appropriate community of reference.
For its part, HRI argues that EPA erred in fixing on the Chapter as the community of reference. It asserts that under Venetie we may look only at the Section 8 *1265 land.[15] However, our precedent bars us from deeming the Section 8 land the community of reference.[16]See Arrieta, 436 F.3d at 1250; HRI, 198 F.3d at 1249; Watchman, 52 F.3d at 1542-43. Alternatively, HRI argues that Venetie abrogated the community of reference test entirely, replacing Watchman with a bright-line test involving only the set-aside and superintendence requirements. HRI points to the plain language of Venetie and also to the policy ramifications of our community of reference test.
HRI notes that the Venetie Court twice touched on the issue of whether to gauge a "community" under § 1151(b) by the people on the land or the land itself. First, the Court expounded, "the Federal Government must take some action setting apart the land for the use of the Indians `as such,' and ... it is the land in question, and not merely the Indian tribe inhabiting it, that must be under the superintendence of the Federal Government." Venetie, 522 U.S. at 531 n. 5, 118 S.Ct. 948 (emphasis in original). With this clarification, the Court rejected the syllogism that because all "[f]ederally recognized tribes" are under the superintendence of the government, all lands owned by those tribes meet the second requirement. Id. Second, and in the same vein, the Court noted that its "Indian country precedents ... do not suggest that the mere provision of `desperately needed' social programs can support a finding of Indian country." Id. at 534, 118 S.Ct. 948. That is, the federal government's role in providing "health, education, and welfare benefits" was not an indicator "of active federal control over the Tribe's land sufficient to support a finding of federal superintendence." Id. (emphasis added).
Thus, HRI reasons that as a legal matter, the Venetie analysis focuses on the land in question  here, the Section 8 land  and not the Indian community encompassing that land. As a policy matter, HRI also argues that the community of reference test causes confusion about jurisdictional matters. In HRI's estimate, the test makes Indian country a black-hole, pulling in non-Indian lands that happen to lie near a sufficiently cohesive and distinct Indian community. HRI and New Mexico, in its amicus brief, point out that this is especially problematic in the "checkerboard" region of northwestern New Mexico. Finally, HRI also suggests that this case implicates the ability of Indian tribes to regulate the affairs of non-Indians on non-Indian fee land. Cf. Plains Commerce Bank v. Long Family Land & Cattle Co., ___ U.S. ____, 128 S.Ct. 2709, 2718-19, 171 L.Ed.2d 457 (2008).
However, HRI was handed down after Venetie and concluded that Venetie had not abrogated the community of reference test. See HRI, 198 F.3d at 1249. The Arrieta court subsequently relied on that holding, at least implicitly. See Arrieta, 436 F.3d at 1250 & n. 2. Regardless of the merits of HRI's arguments, we lack the authority to overturn Watchman, HRI, and Arrieta. See Meyers, 200 F.3d at 720.[17]
*1266 As regards HRI's and the Dissent's concern that the community of reference test as we apply it here renders Indian country a "black-hole" (Dissent at 1270 & n. 3), we emphasize that our holding is narrow and restricted to the facts of this case. We do not hold that any land within the geographical boundaries of a political subdivision of a tribe necessarily has Indian country status; rather, we simply hold that on the facts in the record, the Church Rock Chapter constitutes a dependent Indian community under § 1151(b).
Furthermore, it is worth remembering that Congress exercises plenary power over Indian affairs, and thus "may restrict the retained sovereign powers of the Indian tribes." Washington v. Confederated Bands & Tribes of Yakima Indian Nation, 439 U.S. 463, 501, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979); see also MacArthur v. San Juan County, 497 F.3d 1057, 1067-68 (10th Cir.2007). Thus, should a tribe overreach in an attempt to "define the boundaries of Indian country outside the ... reservation" (Dissent at ____), there would be two critical checks on such an attempt: first, fact-specific review by the federal courts, which would be alert to sham extensions of tribal "communities"; and second, the plenary power of Congress, which extends not only to the definition of "Indian country," but also to the manner in which tribes create or change their political subdivisions.

2. Set-Aside Requirement
Turning now to the Venetie requirements, we ask first whether the Chapter was set aside by the federal government for the use by the Indians as Indian land. See Arrieta, 436 F.3d at 1250 ("We examine the entire Indian community... to ascertain whether the federal set-aside... requirement[ ][is] satisfied."). "[L]and is `validly set apart for the use of Indians as such' only if the federal government takes some action indicating that the land is designated for use by Indians." Buzzard v. Okla. Tax Comm'n, 992 F.2d 1073, 1076 (10th Cir.1993); see also Venetie, 522 U.S. at 531 n. 5, 118 S.Ct. 948.
In accord with the DOI Opinion, EPA concluded that the set-aside requirement was met in this case. The administrative record supports this conclusion. As explained above, the checkerboard pattern of land ownership in this corner of New Mexico is a vestige of land grants to the railroads. In the late 1920s, the federal government purchased the odd-numbered parcels in this area from the Santa Fe Pacific Railroad Company, as well as some of the even-numbered parcels. See HRI, 198 F.3d at 1251-52 (discussing Act of 1928). The government placed the odd-numbered parcels of land into trust for the Navajo Nation and allocated the remainder as allotments to individual Navajos. As a result, 78% of the Chapter land was set aside for the Navajo Nation or individual Navajos by the federal government. See HRI, 198 F.3d at 1252 ("The congressional directive to purchase railroad lands for the benefit of the Navajo is sufficiently clear so that, once it is evident that the lands in question were purchased ... and are held in trust for the Navajo, the lands satisfy the set-aside element ...."); cf. Narragansett Indian Tribe of R.I. v. Narragansett Elec. Co., 89 F.3d 908, 920 (1st Cir.1996) (applying set-aside test  albeit pre-Venetie  and noting, "[t]he considerations made in the trust process demonstrate that when the federal government agrees to hold land in trust, it is prepared to exert jurisdiction over the land" (quotation *1267 omitted)).[18] As such, we determine EPA did not err in this regard.

3. Superintendence Requirement
Lastly, we assess whether the Chapter is "dependent on the federal government such that the federal government and the Indians, rather than the states, exercise primary jurisdiction." Arrieta, 436 F.3d at 1250. Both DOI and EPA determined that the Chapter is superintended by the federal government. Again, in light of the administrative record, EPA's conclusion has an adequate basis in law. See City of Fort Morgan, 181 F.3d at 1159.
"Superintendency over the land requires the active involvement of the federal government." Buzzard, 992 F.2d at 1076. For example, the Buzzard court explained that in McGowan  one of the three cases codified in 18 U.S.C. § 1151  the federal government's "involvement was shown ... by the federal government's retention of title to the land and its regulation of activities [on the land]." Id.; see also United States v. Roberts, 185 F.3d 1125, 1132-33 (10th Cir.1999) (factoring in trust status of Indian land in superintendency analysis).
On the other hand, the Venetie Court noted that its "Indian country precedents... do not suggest that the mere provision of `desperately needed' social programs can support a finding of Indian country." 522 U.S. at 534, 118 S.Ct. 948. Providing "health, education, and welfare benefits" alone does not amount to "active federal control over the Tribe's land sufficient to support a finding of federal superintendence." Id. (emphasis added); cf. Blatchford, 904 F.2d at 549 ("The federal government's relationship with the Yah-Ta-Hey community is not with the community qua community ... [but with] the approximately 350 Indians who happen to live in the Yah-Ta-Hey area.").
Here, the government continues to retain title to 92% of the property in the Chapter, superintending that land for the benefit of the Navajo Nation, its members, and/or individual Navajo allottees. Additionally, as the Navajo Nation's commentary noted, "[t]here is no significant difference in the way the United States interacts with the Church Rock Chapter than the way it interacts with Chapters in the Navajo Reservation proper." (R. docs. 13a at 13; 13b at 133.) HRI does not controvert this factual assertion. Indeed, in addition to providing various health, education, and welfare benefits, see Venetie, 522 U.S. at 534, 118 S.Ct. 948, BIA "is responsible for protecting Navajo Nation trust lands, natural resources, and water rights, and administering various trust benefits on behalf of the [Chapter] members" (R. doc. 44 at 12). We would be hard-pressed to argue that the government does not superintend the reservations. It follows, then, that the government superintends the Chapter. EPA correctly concluded that the Chapter community "qua community," see Blatchford, 904 F.2d at 549, is superintended by the federal government.

III. CONCLUSION
Under our hybrid Watchman/Venetie test, EPA permissibly determined that *1268 the Section 8 land falls within a dependent Indian community. Thus, we DENY HRI's Petition for Review.[19]
FRIZZELL, J., concurring in part, dissenting in part.
In our previous review of this dispute, we stated that "[b]ecause Venetie does not speak directly to the issue, barring en banc review by this court, Watchman, 52 F.3d at 1542-45, continues to require a `community of reference' analysis prior to determining whether land qualifies as a dependent Indian community under the set-aside and supervision requirements of 18 U.S.C. § 1151(b)." HRI, 198 F.3d at 1249.[1] I therefore concur that the doctrine of stare decisis bars this panel from overruling the earlier decision. I further concur that HRI has standing to seek review of the EPA's Land Status Determination. However, I respectfully disagree with the majority's conclusion that EPA's land status determination has an adequate basis in law. Because our precedents do not go so far as to hold that uninhabited, non-Indian land holdings outside a reservation or Pueblo can be part of a small Indian community surrounding a Chapter House located over six miles away, the EPA's conclusion that the entire Church Rock Chapter is the appropriate community of reference does not have an adequate basis in law. On that issue, I must respectfully dissent.
*1269 As noted in the majority opinion, the land in question is uninhabited and lies outside the Navajo reservation. It is not owned by the Navajo Nation. It is not set aside for Indian use. It is not federally superintended. Petitioner HRI, a non-Indian entity, purchased the land in fee simple from a private company which had purchased the land from the United States. The land falls within the bounds of the Church Rock Chapter, a political subdivision of the Navajo Nation. See 26 Navajo Nation Code § 2(6) (2005). All 56,526.04 acres of land within the Church Rock Chapter lie outside the Navajo Reservation and within the bounds of McKinley County, New Mexico.
The Navajo Nation Council determines the number of certified chapters and the boundaries thereof. The Navajo Nation Code currently provides for a maximum of 110 certified chapters. 26 N.N.C. § 3(B). Additional chapters may be certified upon presentation of evidence of need to the Navajo Nation Council. 26 N.N.C. § 3(C). Eleven of the chapters overlap with the Hopi Reservation because Navajos live on Hopi lands. A chapter, either alone or in conjunction with one to three other chapters, defines a geographical area from which delegates are elected to the Navajo Nation Council. Navajos living within the boundaries of the Church Rock Chapter and the Breadsprings Chapter jointly elect two delegates to the Council. 26 N.N.C. § 10(A). The federal government has no input into the boundaries of the chapters or where Chapter Houses should be located. Boundary disputes between chapters appear to be tribal matters resolved by Navajo Tribal Courts with no involvement by the federal government. See Sweetwater Chapter v. Teec Nos Pos Chapter, 2 Nav. R. 13 (Navajo 1979). Certification of chapters and determination of chapter boundaries is performed solely by the Navajo Nation Council, not the federal government.
We remanded to EPA to conduct a community of reference analysis prior to determining whether the Section 8 land qualifies as a dependent Indian community. See HRI, 198 F.3d at 1249, 1254. On remand, EPA concluded that the appropriate community of reference is the entire Church Rock Chapter. HRI's primary argument is that community of reference analysis does not survive Venetie, but we cannot deviate from Watchman absent en banc review.
HRI highlights the fact that the Section 8 land is not in close proximity to the Indian community located around the Chapter House, but lies in closer proximity to the 37 sections of land (more than 40% of the Church Rock Chapter) consisting of "rugged mountain ranges, canyons, and highlands" incapable of sustaining a community. As we noted in Watchman, "[a] community is a mini-society consisting of personal residences and an infrastructure potentially including religious and cultural institutions, schools, emergency services, public utilities, groceries, shops, restaurants, and the other needs, necessities, and wants of modern life." Watchman, 52 F.3d at 1544. Here, as in Watchman, the mine site itself does not contain any of this infrastructure. However, our dependent Indian community analysis requires that we focus not on the mine site alone, but "on the community of reference within the context of the surrounding area." Id. In this case, the evidence may support a conclusion that the community surrounding the Church Rock Chapter House is an appropriate community of reference, but not the entire Church Rock Chapter. The record does not support a conclusion that the Navajo community extends so far from the Chapter House, nor that the political boundaries of the entire Chapter should *1270 have any meaningful bearing on the community of reference determination. Finally, the fact that the Chapter has developed a Chapter planning initiative and land use plan should not be a factor in determining whether it has the authority and jurisdiction to do so relative to particular parcels of property owned by non-Indians in fee simple. The record reflects that McKinley County, New Mexico also has a Comprehensive Plan, which may or may not conflict with that established by the Chapter.
After concluding that the Church Rock Chapter is the appropriate community of reference to which the two-part Venetie test should be applied, the EPA concluded that, because the Church Rock Chapter as a whole qualifies as a dependent Indian community under the federal set-aside and superintendence requirements, the entire Church Rock Chapter  including the Section 8 land lying within  is a dependent Indian community. With today's application of our community of reference test, we take an unprecedented step. Never before has non-Indian fee land outside the exterior boundaries of a reservation or Pueblo been held to be a dependent Indian community. On one occasion, this court ruled that land outside the bounds of a reservation or a Pueblo in the checkerboard area of western New Mexico was a dependent Indian community, but that land had been purchased with Navajo tribal funds, and HRI suggests that the land was titled in the United States.[2]United States v. Martine, 442 F.2d 1022 (10th Cir.1971). In United States v. Arrieta, 436 F.3d 1246 (10th Cir.2006), we held that land within the exterior boundaries of a Pueblo and to which the Pueblo held title is part of a dependent Indian community. As in Watchman, the Arrieta court examined the entire Indian community, not merely the stretch of land at issue, to ascertain whether the federal set-aside and federal superintendence requirements were satisfied. Id. at 1250. The court observed that "[l]and owned by an Indian tribe within the exterior boundaries of land granted to the tribe is necessarily part of the Indian community, even if the state performs some services and maintenance with respect to the land." Because the Pueblo possessed title to the land and the land was within the exterior boundaries of the Pueblo, the court concluded that the land was part of the Pueblo community and therefore subject to federal superintendence.
I must respectfully disagree with the finding that the BIA "superintends the Church Rock Chapter" and with the EPA's determination that "the Chapter is superintended by the federal government." Instead, the federal government owns or superintends a majority of the lands within the political boundaries of the Church Rock Chapter. The distinction is important, as it more clearly specifies the nature of the federal superintendence. Certain properties within the political boundaries of Chapter are federally superintended, but the Chapter itself is not. The Chapter is merely a political subdivision of the Navajo government. The federal government has no input into its boundaries.
One might legitimately be concerned that our application of the community of reference test could be interpreted as permitting the boundaries of communities of reference to be drawn by Navajo legislation defining tribal political subdivisions. As long as a Chapter as a whole satisfies whatever percentage of federal set-aside and supervision a federal court deems necessary, *1271 tribal law may itself define the boundaries of Indian country outside the Navajo reservation. In addition to the non-Indian land within the current boundaries of Navajo Chapters, non-Indian land currently outside the boundaries of those chapters may someday be pulled into the "black hole" complained of by HRI and referenced in the majority opinion.[3]
Commentators in this area of the law have noted the "difficult question" presented "when land that qualifies as Indian country outside of a reservation is part of a community interspersed with non-Indian land holdings." COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, 2005 Edition, § 3.04[2][c]. In criticizing the Supreme Court of New Mexico for declining to incorporate community of reference analysis into New Mexico caselaw and limiting dependent Indian communities to particular parcels of land that individually meet the set-aside and superintendence tests,[4] the commentators suggest that "a central purpose of the 1948 codification [of 18 U.S.C. § 1151] was to avoid checkerboard jurisdiction. See Seymour v. Superintendent, 368 U.S. 351, 358, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962)." Id. at n. 429. A closer look at Section 1151 and Seymour reveals that congressional avoidance of checkerboard jurisdiction is limited to lands within the limits of reservations. In Seymour, the Supreme Court rejected the contention that a parcel of land within the limits of a reservation but held under a patent in fee by a non-Indian was not Indian country. The Court stated "the issue has ... been squarely put to rest by congressional enactment of the currently prevailing definition of Indian country in § 1151 to include all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent * * *." Id. at 357-58, 82 S.Ct. 424. Checkerboard jurisdiction on Indian reservations "was avoided by the plain language of § 1151...." Id. at 358, 82 S.Ct. 424. In short, nothing in § 1151 suggests that Congress intended to avoid checkerboard jurisdiction anywhere other than on reservations. Our application of the community of reference test outside the bounds of a reservation has the effect of eliminating checkerboard jurisdiction outside the bounds of a reservation. Thus, our community of reference test, as applied today, runs counter to congressional intent and may cause great jurisdictional uncertainty and disruption in those states where Indian country consists of original allotments and/or trust lands interspersed with non-Indian land holdings.
Although this panel is bound by our precedents to the community of reference analysis undertaken by the EPA, I would hold that the EPA's conclusion that the entire Church Rock Chapter is the appropriate community of reference is not supported by reasonable, substantial and probative *1272 evidence considering the record as a whole.
NOTES
[*] The Honorable Gregory Frizzell, United States District Judge, Northern District of Oklahoma, sitting by designation.
[1] The first category of Indian country, reservations, "refer[s] to land set aside under federal protection for the residence of tribal Indians, regardless of origin." Felix S. Cohen's Handbook of Federal Indian Law 34 (Rennard Strickland ed., 1982). The third category, Indian allotments, "has a reasonably precise meaning, referring to land owned by individual Indians and either held in trust by the United States or subject to a statutory restriction on alienation." Id. at 40.
[2] HRI has secured a Nuclear Regulatory Commission license to conduct uranium mining on the Section 8 land.
[3] To encourage railroad constructionwhich required massive initial capital outlaysthe federal government granted land directly to certain railroads in the 1860s and 1870s. See Richard White, "It's Your Misfortune and None of My Own": A New History of the American West 246-47 (1993) ("In the mid-nineteenth century, railroads confronted westerners with a frustrating paradox. . . . [D]evelopment would be slow and unrewarding without railroads, but until development took place, railroads could not make a profit. . . ."). These grants typically consisted of alternating one-mile-square parcels on each side of the planned line for the railroad tracks; hence the comparison to a checkerboard. These "[f]ederal land grants initiated the first burst of western railroad building in the middle and late 1860s." Id. at 246.

Thereafter, in 1928, Congress authorized the United States to purchase certain parcels of land owned by the Santa Fe Railroad Company in the region surrounding Section 8. Act of May 29, 1928, 45 Stat. 883, 899-900 ("1928 Act"). Those lands were to be held in trust by the United States for the benefit of the Navajo tribe or for individual Navajo allottees.
[4] The Eastern Navajo Agency is an administrative arm of the Bureau of Indian Affairs ("BIA"). This Agency, which also superintends the Church Rock Chapter, "approves or disapproves contracts, leases and other agreements, easements, permits, etc., involving Navajo Tribal trust lands, individual Indian allotments, natural resources, water and other uses of Navajo Nation trust assets." (R. doc. 1 at 7.)
[5] Section 300h-1(b) explicates the process by which a state may take "primacy" (primary responsibility for implementing and enforcing a SDWA program that complies, at minimum, with the provisions of § 300h). Should EPA "disapprove[ ] a State's program (or part thereof) . . . [or] determine[ ] . . . that a State no longer meets the requirements . . . or if a State fails to submit an application" for primacy, EPA must instead promulgate regulations that prescribe a § 300h-compliant program for that state. 42 U.S.C. § 300h-1(c).

In a 1986 amendment, 42 U.S.C. § 300h-1(e), Congress provided for Indian tribe "primacy" under specified circumstances. Until a tribe assumes primacyafter EPA has conferred Treatment as a State ("TAS") status on the tribe, see 42 U.S.C. § 300j-11the "currently applicable" state or federal default UIC regulations continue to apply. See 42 U.S.C. § 300h-1(e).
[6] "[U]nderground injection . . . means the subsurface emplacement of fluids by well injection. . . ." 42 U.S.C. § 300h(d)(1). In-situ leach uranium mines, of the type HRI proposes to operate on Section 8, require underground injection. "Instead of manually excavating the rock from underground as in conventional mining and placing it in large piles on the surface, water wells are used, very much like those for a home. Oxygen is added to the native ground water from the orebody, and that water is continuously recirculated until most of the uranium is recovered." (R. doc. 15c app. II at 1, 3-4.)
[7] "[T]he definition of Indian lands adopted for the UIC program is set forth in 40 CFR 144.3. Whatever definition is chosen, there will be disagreements about whether particular lands fall within the definition. . . . In order to ensure regulation of injection wells and minimize any disruption, pending the resolution of jurisdictional disputes, EPA will implement the Federal UIC program for disputed lands." 53 Fed.Reg. at 43097 (emphasis added).
[8] As explained by the HRI court,

After Congress in 1986 authorized EPA to treat Indian tribes as states for SDWA purposes, the agency approved the Navajo Nation, in 1994, for [TAS] with respect to "all lands located within the exterior boundaries of the Navajo Reservation . . . all satellite reservations . . . and the following lands outside the boundaries of the formal Navajo Reservation within the Eastern Navajo Agency: all Navajo tribal trust lands, all Navajo allotments, and all tribal fee lands and federal lands previously determined to be part of `Indian country.'" EPA did not approve the Navajo Nation's TAS application with respect to private fee lands and state trust lands within the Eastern Navajo Agency. . . .
198 F.3d at 1232-33 (emphasis added) (citations omitted).
[9] Simultaneously, HRI also appealed EPA's determination that Section 17, a parcel of land contiguous to Section 8 but held in trust for the Navajo by the United States, was "Indian country" under § 1151. See HRI, 198 F.3d at 1230-31.
[10] As EPA notes, standing was not at issue in the first HRI case because of New Mexico's involvement as a petitioner. Cf. Massachusetts v. EPA, 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (holding that "[o]nly one of the petitioners needs to have standing to permit us to consider the petition for review").
[11] "[T]he United States Environmental Protection Agency . . . has determined that [the Section 8 land] is part of a dependent Indian community under 18 U.S.C. section 1151(b) and, thus, `Indian country.' EPA is therefore the appropriate agency to consider underground injection control permit applications under the Safe Drinking Water Act . . . for that land." (Resp't Add. at 1.)
[12] In pertinent part, § 1151 provides,

[T]he term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
18 U.S.C. § 1151 (emphasis added).
[13] The Venetie Court concluded that Congress had derived the "dependent Indian community" category from three Supreme Court cases: United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913); United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914); and United States v. McGowan, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938). See Venetie, 522 U.S. at 528-30, 118 S.Ct. 948. Accordingly, the Court held that § 1151(b) codifies the set-aside and superintendence requirements that emerge from those precedents. Id. at 530, 118 S.Ct. 948.
[14] In Arrieta, the defendant had allegedly committed a crime on a public road, Shady Lane, within the bounds of the Pojoaque Pueblo in New Mexico. 436 F.3d at 1247. The land underlying the road was Pueblo land, but the road was maintained by Santa Fe County. Id. at 1247-48. Moreover, the parcels of land alongside the road belonged to non-Indians. Id. at 1248. Arrieta sought dismissal of his federal indictment for lack of subject-matter jurisdiction. Id.

The issue, then, was "whether Shady Lane c[ould] be classified as a `dependent Indian community.'" Id. at 1250. This court turned first to the Venetie two-prong test, but, citing HRI, continued on to note that the Venetie test "partially replaces our earlier four-part test, enunciated in Watchman ...." Id. at 1250 n. 2. In light of HRI, the court was compelled to "examine the entire Indian community, not merely a stretch of road, to ascertain whether the federal set-aside and federal superintendence requirements are satisfied." Id. at 1250 (emphasis added). Thus, "even if the state performs some services and maintenance with respect to the land," land owned by a tribe within the bounds of a plot granted to the tribe is "necessarily part of the Indian community." Id. As such, the court held that "all lands within the exterior boundaries of a Pueblo land grant, to which the Pueblo hold title, are Indian country...." Id. at 1251.
Although the Arrieta court did not explicitly discuss the "community of reference" test, the court did consider the "entire Indian community." This is consistent with HRI's discussion of Venetie and Watchman. Moreover, there was no need in Arrieta for a detailed discussion of the community of reference because Pojoaque Pueblo unequivocally was the appropriate community.
[15] HRI also off-handedly intimates that Gallup is another potential community of reference. A glance at the map dispels this contention.
[16] Despite these precedents, many of the comments submitted to EPA were premised on the belief that the Section 8 land itself  and not the broader community of reference land  was the land that must meet the Venetie requirements.
[17] Because the crux of this case is EPA's authority to regulate activities on the Section 8 land  and not the jurisdiction of the Navajo to regulate those activities  we will not wander down the Plains Commerce Bank path. We also reject HRI's contention that EPA strayed from the mandate issued by the HRI court.
[18] In addition, the BIA and BLM have allocated approximately 8,000 more acres of land in the Chapter for the exclusive use by the Navajo as grazing lands. With this land added to the parcels purchased from the railroad, 92% of the land in the Chapter has been set aside for use by the Navajo.

At oral argument, we pressed EPA on "how much" of the community of reference must be set aside. We need not establish a particular percentage because we determine that 78% (and arguably even 92%) of the Chapter was set aside for the Navajo; in our view, even the smaller percentage satisfies the set-aside test.
[19] Additionally, we GRANT (1) the motion of the National Mining Association ("NMA") for leave to file a brief as amicus curiae; (2) the NMA's motion for leave to file a Reply brief; and (3) amicus New Mexico's motion for leave to file a Reply brief. All three briefs, of course, were previously submitted and have been considered by the court. Similarly, we GRANT HRI's motion for leave to file an appendix of authorities. As HRI notes, many of the materials cited in the EPA Determination are not easily located. In fact, the materials that are most helpful for our purposes (portions of certain histories of the Navajo) are those that EPA referenced in its Determination. While "the focal point for judicial review" under the Administrative Procedure Act "should be the administrative record already in existence, not some new record made initially in the reviewing court," Am. Coke & Coal Chems. Inst. v. EPA, 452 F.3d 930, 945 (D.C.Cir.2006) (quotation omitted), this court is capable of sorting the wheat which EPA considered from the chaff. Cf. Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of Energy, 485 F.3d 1091, 1096 (10th Cir.2007) ("It is only in extremely limited circumstances ... that we will consider extra-record evidence." (quotation omitted)). In this case, our conclusion and holdings are predicated on the administrative record.
[1] In our earlier review we noted that Venetie "reduced substantially" the weight to be afforded the second and third prongs of the four-part test adopted in Watchman for determining whether a given community of reference constitutes a dependent Indian community. HRI, 198 F.3d at 1232, n. 3. Those two prongs are "(2) `the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area,'; [and] (3) whether there is `an element of cohesiveness... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality,'..." Watchman, 52 F.3d at 1545 (quoting U.S. v. State of South Dakota, 665 F.2d 837, 839 (8th Cir.1981)). Although we recognized the limited relevance of the two prongs, we continue to require a community of reference analysis which affords them substantial weight and effect. The two Watchman factors whose weight Venetie did not reduce  "(1) whether the United States has retained `title to the lands which it permits the Indians to occupy' and `authority to enact regulations and protective laws respecting this territory,'... and (4) `whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples[,]'"  are in essence the set-aside and superintendence requirements required by Venetie. I agree, however, that this panel lacks the authority to overturn Watchman and HRI.
[2] Although the court did not address set-aside in its opinion, HRI reports the United States' appeal brief in that case states that "title [was] in the United States (Tr. 89) and on United States land the Indians are permitted to use."
[3] Under tribal law, the Navajo Nation Council may extend the political boundaries of those Chapters lying on the outer fringe of the contiguous region comprising the "Navajo Chapters and Election Communities" (as well as the Ramah, Alamo and Canoncito Chapters, which lie southeast of, and unconnected with, the other Chapters). By virtue of today's decision, if such extensions occur, and if a federal court determines that the Chapter as extended satisfies the requisite percentage of federal set-aside and supervision, it may be possible to extend Indian country onto non-reservation, non-Indian land holdings presently outside Chapter boundaries.
[4] See State v. Frank, 132 N.M. 544, 52 P.3d 404, 409 (2002). See also State v. Quintana, 143 N.M. 535, 178 P.3d 820, 822 (2008). The Ninth Circuit also rejected its multi-factor balancing test in favor of the Supreme Court's narrow definition of dependent Indian communities. Blunk v. Arizona Dept. of Transp., 177 F.3d 879, 883 (9th Cir.1999).