*1168 EBEL, Circuit Judge,
joined by BRISCOE, Chief Judge,
HENRY, LUCERO, and MURPHY, Circuit Judges, dissenting.
In Alaska v. Native Village of Venetie Tribal Government, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998), the Supreme Court rejected the Ninth Circuit’s multi-factor test for determining whether a given area of land constitutes a dependent Indian community. Instead, the Court held that a two-part test should be applied to determine whether the “land in question” is a dependent Indian community: first, by considering whether the land was “set aside by the Federal Government for the use of the Indians as Indian land,” and second, assessing whether the land is “under federal superintendence.” Id. at 527, 118 S.Ct. 948.
While this test is straight-forward enough, the Supreme Court did not address a separate, antecedent question: to what area of land should this two-part test be applied? In other words, how do we determine the “land in question”? Over the last twenty years in this circuit, we have held that a “community-of-reference” test must be employed to determine the appropriate community, before determining whether that community is both “dependent” and “Indian.” See, e.g., Hydro Res., Inc. v. ERA (“HRI II”), 562 F.3d 1249, 1261 (10th Cir.2009); Hydro Res., Inc. v. EPA (“HRI I ”), 198 F.3d 1224, 1248 (10th Cir.2000); United States v. Adair, 111 F.3d 770, 774 (10th Cir.1997); Pittsburg & Midway Coal Mining Co. v. Watchman, 52 F.3d 1531, 1543 (10th Cir.1995), abrogated in part by Venetie, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30; Pittsburg & Midway Coal Mining Co. v. Yazzie, 909 F.2d 1387, 1431 (10th Cir.1990).
Today, the majority holds that, even though the Court in Venetie did not so much as consider the appropriate way to determine the relevant community—and, to the extent it did consider the question, it looked at the broader community rather than a narrow tract of land—Venetie nevertheless abrogated our community-of-reference test. By overturning decades of our precedent, the majority introduces confusion into an area of law that had been largely settled, and does so based on a case that did not even consider the issue. I respectfully dissent.
I. Background
The Church Rock Chapter of the Navajo Nation was formally certified as a local governmental unit by the Navajo Nation Council in 1955, although residents built a Chapter House for local governance purposes in 1946. The Chapter, which is located just east of the town of Gallup, New Mexico, consists of over 57,000 acres. The federal government holds approximately 52% of this land in trust for the Navajo nation, and holds an additional 26% in trust in the form of allotments to individual Indians. The Bureau of Land Management (“BLM”) owns an additional 10% of the land, which is subject to grazing leases granted to Navajos. In addition, the state of New Mexico owns about 4% the remaining land, and private interests own approximately 6%.[1]
In 1970, United Nuclear Corporation (“UNC”) purchased 160 acres of land in the Church Rock Chapter, in the southeast *1169 corner of Section 8, Township 16N, Range 16W (“Section 8”), from the United States. HRI II, 562 F.3d at 1254. Hydro Resources, Inc. (“HRI”), a non-Indian mining corporation, later purchased the land, as well as UNO’s patents for uranium-mining claims on that land, with the intent to operate a mine. Id. HRI thus owns this land in fee simple. The remaining three-fourths of Section 8 are owned by the United States in fee simple. Section 8 is surrounded on two sides by land owned by the United States in fee, and on two sides by land owned by the United States and held in trust for the Na\'ajo.
No one lives on the Section 8 land, though the three-fourths of Section 8 not owned by HRI are subject to grazing permits issued by the United States Bureau of Indian Affairs (“BIA”). Located approximately six miles northeast of the Chapter House, the infrastructure on HRI’s Section 8 land is primarily provided by the State of New Mexico and McKinley County. The state maintains the only access road to Section 8, State Highway 566, and HRI pays annual property taxes on the land to McKinley County. If HRI ever begins operating a mine on the property, the Public Service Company of New Mexico will provide it electricity, and the New Mexico State Water Engineer has already approved HRI’s request for water rights.
In addition to the land in the Chapter being overwhelmingly owned by or for Navajos, the demography of the Chapter also shows an overwhelming Navajo presence. According to the 2000 census, approximately 98% of the Chapter’s 2,802 residents are Navajo, and most of the rest are married to a Navajo. The residents primarily speak Navajo. Many residents of the Chapter raise livestock on Chapter lands—sometimes supplementing their income by producing traditional wares such as jewelry, stone and wood carvings, and by sewing and weaving—although some work in the nearby town of Gallup, which is located outside the boundaries of the Chapter.
The Chapter House, approximately three miles east of Gallup, acts as the social and political center for the Church Rock Chapter. Eighty-eight percent of Church Rock residents go to the Chapter House at least once a month. The Chapter House includes a Head Start center, elementary school, churches, and other buildings that provide for many of the residents’ educational, spiritual, and health needs. The Navajo Nation “provides housing, electricity, drinking water, waste-water treatment, sewer sendees, and utilities,” as well as police protection to residents of the Chapter, and the Chapter itself provides “scholarships, home repair and purchase assistance, and meals for seniors.” (R. doc. 44 at 21.) The federal government also provides some services in the Chapter, including road maintenance, grazing management and permitting, social and health services, and conservation services. While the state of New Mexico and the county maintain the main roads, most schools, and provide fire and EMS services, the Superintendent of the Eastern Navajo Agency of the BIA confirmed that the BIA considers the Church Rock Chapter to be a “distinct communit[y] of Navajo Indians who depend primarily on federal and tribal governmental services and protection.” (R. doc. 13b at 132.)
II. Discussion
As discussed more fully in the majority opinion, HRI now seeks a determination that EPA incorrectly decided that HRI’s Section 8 land is part of a dependent Indian community and thus subject to EPA’s jurisdiction for Safe Drinking Water Act (“SDWA”) purposes rather than the jurisdiction of the New Mexico Environmental Department (“NMED”). HRI argues that *1170 EPA improperly considered the entire Church Rock Chapter in concluding that Section 8 was within a dependent Indian community, and that HRI’s Section 8 land, by itself, does not constitute a dependent Indian community for purposes of § 1151(b). EPA and the Navajo Nation maintain that EPA correctly determined that HRI’s Section 8 land is within a dependent Indian community and thus is Indian country under § 1151(b).[2]
A. The meaning of the word “communities” in 18 U.S.C. § 1151(b)
The question presented by this appeal requires the court to determine the meaning of the phrase “dependent Indian com-munitty]” as used in 18 U.S.C. § 1151(b). “As with any question of statutory interpretation, oui' analysis begins with the plain language of the statute.” Jimenez v. Quarterman, - U.S. —, 129 S.Ct. 681, 685, 172 L.Ed.2d 475 (2009); sec also Coffey v. Freeport McMoran Copper & Gold, 581 F.3d 1240, 1245 (10th Cir.2009). Title 18, United States Code, Section 1151 provides:
the term “Indian country,” as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
18 U.S.C. § 1151 (emphasis added). While technically a criminal statute, § 1151 applies in civil contexts as well. See Venetie, 522 U.S. at 527, 118 S.Ct. 948 (citing DeCoteau v. Dist. County Court for Tenth Judicial Dist., 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975)); see also Enlow v. Moore, 134 F.3d 993, 995 n. 2 (10th Cir.1998) (“18 U.S.C. § 1151 ... defines ‘Indian country’ for civil as well as criminal jurisdiction.”).
It is a well-settled principle of statutory construction that “we are to give meaning *1171 to every word of a statute where possible.” Smith v. Midland Brake, Inc,, 180 F.3d 1154, 1165 (10th Cir.1999) (en banc) (citing Ratzlaf v. United States, 510 U.S. 135, 140, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994)). Therefore, I begin from the uncontroversial premise that “dependent Indian communities” in subpart (b) must have some meaning that is independent from the meanings of “Indian country” provided in subparts (a) and (c) of the statute. Sub-part (a) includes as “Indian country” “all land within the limits of any Indian reservation under the jurisdiction of the United States Government.” 18 U.S.C. § 1151(a). Subpart (c) applies “Indian country” to “Indian allotments,” which refers to “land owned by individual Indians and either held in trust by the United States or subject to a statutory restriction on alienation.” Felix S. Cohen, Handbook of Federal Indian Law § 3.04[2][c][iv], at 195 (2005 ed.) (hereinafter “Cohen”); see also United States v. Ramsey 271 U.S. 467, 470, 46 S.Ct. 559, 70 L.Ed. 1039 (1926). Thus, a “dependent Indian community” must refer to something other than reservation lands and allotted lands. Venetie, 522 U.S. at 527, 118 S.Ct. 948 (concluding that the phrase “dependent Indian communities ... refers to a limited category of Indian lands that are neither reservations nor allotments”); see also Okla. Tax Comm’n v. Sac & Fox Nation, 508 U.S. 114, 123, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993) (“Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments.... ”).
The use of the word “community” in the statute implies the existence of some setting within which the property in question is to be evaluated. Other areas of the law that draw upon the notion of a community show that community means context. For example, the obscenity standard developed by the Supreme Court in the First Amendment arena requires the trier of fact to apply “contemporary community standards,” a contextual inquiry that may produce different outcomes depending upon the community in which the test is applied. Miller v. California, 413 U.S. 15, 32, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (“It is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City.”). Similarly, when considering whether a governmental action violates the Establishment Clause of the First Amendment, courts consider whether a reasonable observer, “aware of the history and context of the community and forum in which the religious display appears,” would consider the action as endorsing religion. McCreary County, Ky. v. ACLU, 545 U.S. 844, 866, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (quoting Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O’Connor, J., concurring in part and concurring in judgment)). Zoning regulations are also intended to “facilitate the orderly development of communities by confining particular uses to defined areas,” so city planners must look at the context of the area in deciding what sorts of uses to allow in the community. 83 Am.Jur.2d Zoning & Planning § 2 (2009). Throughout the law, then, the term “community” is used to place the object of judicial scrutiny in an appropriate context.
The structure of § 1151 further demonstrates that community requires a contextual analysis rather than the parcel-by-parcel analysis favored by HRI. Subsections (a) and (c) of § 1151 both refer to land: § 1151(a) references “all land within the limits of any Indian reservation,” and § 1151(c) applies to “all Indian allotments,” which are by definition specific tracts of land. See Cohen § 3.04[2j[c][iv¡, at 195. Subsection (b), by contrast, does *1172 not refer directly to land, but instead uses the broader concept of “community.” The ordinary use of the term “community” makes it clear that the term necessitates a broader approach. Someone looking at a vacant lot in the middle of a developed neighborhood would not say that the vacant lot is not part of the community that surrounds the lot on all sides. Similarly, a parcel of 160 acres completely surrounded by a community of 57,000 acres should not fail to be part of that community simply because of the ownership status of that parcel.
The purpose of § 1151 provides additional guidance for the proper interpretation of the term “community” in § 1151(b). “[A] central purpose of the 1948 codification was to avoid checkerboard jurisdiction.” Cohen § 3.04[2][c][iii], at 194 n.429 (citing Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351, 358, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962)). Section 1151 was originally passed as a criminal statute, and, in passing the statute, Congress sought to foreclose a situation in which “law enforcement officers operating in [a checkerboard] area [would] find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense ... is in the State or Federal Government.” Seymour, 368 U.S. at 358, 82 S.Ct. 424. While the Supreme Court in Seymour was referring to § 1151(a), which explicitly provides that Indian country applies to reservations “notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,” I think the Court meant what it said when it stated that “[s]uch an impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151.” Id.
Felix Cohen agreed that it is “the full statute [that] was intended to reduce earlier difficulties which had arisen from the ‘checkerboarding’ of land ownership and rights-of-way. Thus, patented parcels of land and rights-of-way within dependent Indian communities should also be within Indian country.” Felix S. Cohen, Handbook of Federal Indian Law, Ch. 1 § D3e, at 39 (1982 ed.) (hereinafter “Cohen (1982)”) (emphasis added). Accordingly, the purpose of Congress’s codification of § 1151—to smooth out much of the checkerboard jurisdiction that complicated enforcement of criminal law—shows that a “community” approach, rather than an isolated parcel-by-parcel approach, should be used to determine whether land is Indian country under § 1151(b).
The majority’s conclusion that title alone is determinative of whether a parcel of land is “Indian country” under § 1151(b) would completely eviscerate this congressional purpose.[3] The problem of checker *1173 board jurisdiction is caused by an interspersing of Indian-owned and non-Indian-owned lands in a relatively small geographic area. Because the checkerboard problem is earned by title, Congress would not have sought to remedy the problem by relying exclusively on title to determine whether land is Indian country. Furthermore, if Congress had intended title to be determinative, it easily could have said so in § 1151. Instead, two of the three subsections of the statute (§ 1151(a) and (c)) clearly indicate that title is not determinative, and the third subsection (§ 1151(b)) uses a word, “communities,” that, as discussed above, is inconsistent with a focus solely on title. In fact, the only time Congress alludes to title at all in the statute is to state that title is not determinative of land’s Indian country status. See 18 U.S.C. § 1151(a) (defining Indian country to include “all land within the limits of any Indian reservation ... notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation”); id. § 1151(c) (including rights-of-way running through Indian allotments as Indian country). While the Supreme Court has held that privately-owned land can constitute Indian country under § 1151, see Solem v. Bartlett, 465 U.S. 463, 468, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) (applying § 1151(a) to hold that “Indian country ... include[s] lands held in fee by non-Indians”), today, this court becomes the first federal appellate court to hold that land is not Indian country solely because of who owns title. The language of the statute simply does not compel such a drastic result.
This interpretation of the word “communities” in § 1151(b) is consistent with the meaning the Supreme Court gave to that word in a related Indian statute. Section 1154, which prohibits the introduction of spirituous beverages into Indian country, starts with the same definition of “Indian country” found in 18 U.S.C. § 1151, but then specifically restricts that term, for the purposes of § 1154, by excluding “fee-patented kinds in non-Indian communities or rights-of-way through Indian reservations” from Indian country status. 18 U.S.C. § 1154(c) (emphasis added).[4] The obvious inference to be drawn from this exclusion is that the status of a particular parcel of land as “fee-patented” is not determinative of its status as “Indian country” under § 1151, or else there would have been no need to specifically exclude such lands from the “Indian country” definition in § 1154.
In interpreting § 1154, the Supreme Court also confirmed this interpretation of the word “communities.” In United States v. Mazurie, the defendants were charged under 18 U.S.C. § 1154 with introducing spirituous beverages into Indian country. 419 U.S. 544, 545, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975),[5] The defendants in Mazurie operated a bar within the boundaries of the Wind River Reservation in central Wyoming, but “substantial tracts of non-Indian-held land are scattered within the reservation’s boundaries,” and the bar itself was located on privately-owned fee land within the reservation. Id. at 546-47, 95 S.Ct. 710. The Court agreed that the unincorporated town and surrounding areas w^ere an “Indian community” within the meaning of 18 U.S.C. § 1154(c), based principally on the fact that over 80% of the families in the area were Indian, and 223 out of the 243 students enrolled in the nearby school were Indian. Id. at 550-52, *1174 95 S.Ct. 710. The Court thus gave meaning to the word “communities” in the statute by looking at the surrounding area of land in which the bar was located, rather than simply looking at the plot of land itself. This further demonstrates that the word “communities,” as used in the Indian statutes, requires an approach that places the specific parcel of land at issue in the context of the surrounding area.[6]
Finally, it should be remembered that this case arises specifically in an environmental context. This case is before the court as a review of a determination made by the EPA pursuant to the SDWA that the portion of Section 8 at issue is a depen-dant Indian community and that “EPA is therefore the appropriate agency to consider underground injection control permit applications under the [SDWAJ for that land.” (R. doc. 44 at 1.) In the natural resources context, the notion of community assumes heightened importance. Aquifers generally are not found underneath just one specific isolated parcel of land, but rather extend under surrounding lands as well, and indeed the aquifer underneath HRI’s Section 8 land runs underneath much of the Chapter. The externalities produced by a mining operation—including pollution, traffic, and the aesthetic harms created by having a large mining operation nearby—also affect the surrounding community. Indeed, the SDWA recognizes that water is a communal good that is affected by those around it and focuses much of its protection on “community water system[s].” 42 U.S.C. § 300f(15). Given the potential for diffuse harm posed by a mining operation, then, encouraging the checkerboard jurisdiction that Congress sought to avoid in enacting § 1151 makes even less sense in the SDWA context than it does in the criminal context in which the statute was originally enacted.
For these reasons, the word “communities” in § 1151(b) requires consideration of the land in context, and not in isolation on a parcel-by-parcel basis. See Cohen § 3.04[2][c][iii], at 194 (stating that a parcel-by-parcel approach “reads the word ‘communities’ out of the statute and increases the possibility of checkerboard jurisdiction”).
B. Venetie
The majority concludes that the Supreme Court’s decision in Venetie forecloses a community-of-reference analysis. I disagree.
A brief discussion of the factual background of Venetie elucidates what the Court did and did not decide in that case. *1175 In Venetie, the Native Village of Venetie Tribal Government sought to tax a private contractor and the State of Alaska, who were joint venturers in the construction of a public school on a specific parcel of land in the village of Venetie. 522 U.S. at 523, 118 S.Ct. 948. Venetie and another neighboring village had been part of a reservation established in 1943 for the Neets’aii Gwich’in Indians. Id. at 523, 118 S.Ct. 948. In 1971, however, Congress enacted the Alaska Native Claims Settlement Act (ANCSA), which “revoked the various reserves set aside ... for Native use” and extinguished all native claims to Alaska land.[7] Id. at 524, 118 S.Ct. 948 (citing 43 U.S.C. §§ 1603, 1618(a)) (quotations omitted). As compensation, Congress authorized the transfer of $962.5 million and 44 million acres of Alaska land to state-chartered private business corporations. Id. Under the ANCSA, the shareholders of these corporations had to be Alaska Natives. Id. The land issued to these corporations was transferred in fee simple, with no restrictions on subsequent transfers of the land. Id. Two such corporations were formed for the Neets’aii Gwich’in, and the federal government, pursuant to the ANC-SA, conveyed fee simple title to the land previously constituting the Venetie Reservation to those corporations as tenants in common. Id.
The Court of Appeals for the Ninth Circuit applied a six-factor balancing test to determine whether the former-reservation lands constituted a dependent Indian community, and thus was subject to taxation by the tribe for work performed in the community by non-Indian members. State of Alaska ex rel. Yukon Flats Sch. Dist. v. Native Village of Venetie Tribal Gov’t, 101 F.3d 1286, 1294 (9th Cir.1996). After applying this test, the Ninth Circuit concluded that the lands were both set aside and superintended by the federal government, and that the land was therefore Indian country under 18 U.S.C. § 1151(b). Id, at 1302.
The Supreme Court reversed. Rejecting the multi-factor balancing test employed by the Ninth Circuit to determine whether the land was set aside and superintended as a dependent Indian community, the Court held that § 1151(b) “refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements—first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence.” Venetie, 522 U.S. at 527, 118 S.Ct. 948.
Applying this test, the Court concluded that neither requirement was met. As to the set-aside requirement, the ANCSA explicitly “revoked all existing reservations in Alaska ’set aside by legislation or by Executive or Secretarial Order for Native use,’ ” and so the land was not currently set aside for Native use. Id. at 532, 118 S.Ct. 948 (quoting 43 U.S.C. § 1618(a)). The land also did not meet the federal superintendence requirement, as the ANC-SA was intended to forestall a “lengthy wardship or trusteeship,” 43 U.S.C. § 1601(b), and thus ended any superintendence of the lands. Venetie, 522 U.S. at 533, 118 S.Ct. 948. Accordingly, the Tribe’s lands did not constitute a dependent Indian community, and hence did not constitute Indian country, within the meaning of 18 U.S.C. § 1151(b).
Section 1151(b) uses three criteria to define Indian country: (1) it must be dependent; (2) it must be Indian; and (3) it must be a community. Venetie provides the criteria for determining whether an *1176 area of land satisfies (1) and (2): (1) the land is “dependent” if it is under federal superintendence, and (2) the land is “Indian” if it has “been set aside by the Federal Government for the use of the Indians as Indian land.” Venetie, 522 U.S. at 527, 118 S.Ct. 948. Yet the Venetie Court did not address the third criteria: determining whether the land in question is a community. The set-aside and superintendence requirements address only the dependent and Indian character of the “land in question.”
The “community” requirement determines what area of land constitutes “the land in question.” That question was not addressed specifically in Venetie other than to accept, without discussion, that it was the entire land formerly constituting the Neets’aii Gwich’in reservation before it was extinguished. In the present case, the majority views HRFs quarter of Section 8 as the “land in question.” One would therefore expect, if it were following the majority’s analysis, that the Venetie Court would have narrowly considered whether just the land on which the school was to be built was a dependent Indian community. But the Court decidedly did not do so. Instead, the Court in Venetie looked at all of the land that previously composed the Venetie Reservation—not just the site of the proposed school—to determine whether that land constituted a dependent Indian community. Venetie, 522 U.S. at 523, 118 S.Ct. 948 (“In this case, we must decide whether approximately 1.8 million acres of land in northern Alaska, owned in fee simple by the Native Village of Venetie Tribal Government pursuant to the [ANC-SA], is ‘Indian country.’”) (emphasis added); see also id. at 532, 118 S.Ct. 948 (“The Tribe’s ANCSA lands do not satisfy either of these requirements.”). Therefore, based solely on the words “land in question,” which are employed to refer to a broad area of land encompassing the narrow strip of land directly in dispute in Venetie, the majority overturns a long history of Tenth Circuit authority that requires a separate determination of the appropriate community.
I agree with the majority that Venetie abrogated the multi-factor test for determining whether a given community is a dependent Indian community. See HRI II, 562 F.3d at 1262 (“Venetie ... altered the second step of the Watchman inquiry.” (citing HRII, 198 F.3d at 1248)). However, Venetie simply did not discuss the first step of the Watchman analysis, namely, how the appropriate community is to be defined. At best, Venetie endorsed the application of its two-part requirement of set-aside and superintendence to a broader community of reference than just the isolated parcel where the dispute is situated. At worst, Venetie simply does not address the issue of whether a community of reference should first be determined. However, the one thing that cannot be concluded from Venetie is that it abrogated the Tenth Circuit’s long-standing community-of-reference test to determine the relevant community to which the set-aside and superintendence factors are then applied in order to determine whether the community is a dependent Indian community.
C. Other interpretations of Venetie
Today’s decision brings this circuit into conflict with the leading treatise in the field. According to Professor Cohen’s treatise, the interpretation of § 1151(b) that focuses solely on the narrow parcel under inquiry “reads the word ‘communities’ out of the statute and increases the possibility of checkerboard jurisdiction.” Cohen 3.04[2][c][iii], at 194. Furthermore,
[t]he Court’s decision in Venetie explicitly approved factors that appear to allow consideration of an entire community, so that fee lands might be considered part of a dependent Indian community: *1177 “[T]he degree of federal ownership of and control over the area, and the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples.”
Id. (quoting Venetie, 522 U.S. at 531 n. 7, 118 S.Ct. 948) (emphasis added). Cohen thus adopts the more natural reading of “dependent Indian communities ” and concludes, as would I, that “patented parcels of land and rights-of-way may also be within Indian country if they are within a dependent Indian community.” Id. at 195.
The majority cites two cases from our sister circuits that it claims support its position. Upon closer review, however, these opinions do not address the community-of-reference question with which we are presented here. First, in Blunk v. Arizona Department of Transportation, 177 F.3d 879 (9th Cir.1999), the Navajo Nation purchased land (the “Navajo Fee Land”), ten miles from the Navajo reservation, from a private owner, and leased a portion of that land to a non-Indian who erected billboards on the land. Id. at 880. When the state required the lessee to obtain a permit for his billboards, the lessee filed suit in federal court seeking a declaratory judgment that state regulation of the billboards was preempted by federal law and Navajo sovereignty. Id. at 881. In considering whether the Navajo Fee Land was “Indian country” so that preemption may preclude the state’s regulation of the land, the Ninth Circuit concluded that “Venetie controls our decision.” Id. at 883. “The Navajo Fee Land is neither within the Navajo reservation nor is it an Indian allotment. The Navajo Fee Land is not a dependent Indian community because the land was purchased in fee by the Navajo Nation rather than set aside by the Federal Government.” Id. at 883-84. Additionally, the federal government did riot “exercise any ... level of superintendence over the Navajo Fee Land.” Id. at 884.
. Blunk, however, did not consider the threshold question presented here: namely, whether § 1151(b) requires that the court determine the appropriate community of reference before applying the Venetie requirements. To the extent Blunk is relevant to this case, it supports our conclusion, for the Bhmk court did not consider whether the narrow billboard leasehold— what HRI would label the “land in question”—was a dependent Indian community by itself, but rather whether the entire Navajo Fee Land, of which Blunk had only leased a portion, constituted such a community. See Blunk, 177 F.3d at 883 (“The Navajo Fee Land is not a dependent Indian community. ...”). The most that could be gleaned from Bhmk is that the Ninth Circuit did not consider whether a threshold requirement to determine a “community of reference” survived Venetie. At worst (from HRI’s perspective), Bhmk is contrary to its position here in the present appeal.
In addition, the facts of our case bear little resemblance to those in Bhmk. Whereas 78% of the Church Rock Chapter is owned by the federal government in trust for either the Navajo Nation or individual Navajos, the tribe purchased the land in Blunk and owned title to it. In fact, Blunk is consistent with Tenth Circuit precedent. In a pre-Venetie case, this court concluded, as the Ninth Circuit did in Bhmk, that land purchased and owned by a tribe in fee simple outside the reservation and not otherwise a part of a dependent Indian community was not Indian country merely by virtue of its tribal ownership, because the land was neither set-aside nor superintended by the federal government. Buzzard v. Okla. Tax Comm’n, 992 F.2d 1073, 1076 (10th Cir.1993). Blunk therefore should not inform this court’s analysis of a community of land that is predominantly owned by the federal government rather than the tribe.
*1178 In the second case cited by the majority, the Eighth Circuit held that 174.57 acres of land acquired by the United States in trust on behalf of the tribe was a dependent Indian community because it met both the set-aside and superintendence requirements. Yankton Sioux Tribe v. Podhradsky, 577 F.3d at 970-71. It does not appear that the parties in that case contested that the entire acreage at issue constituted the appropriate community of reference, and so the case provides no guidance on whether such an inquiry is precluded by Venetie. This case is also inapt because, in this circuit, “ ‘lands held in trust by the United States for the Tribes are Indian Country within the meaning of § 1151(a)’” as informal reservations, and thus need not be analyzed under § 1151(b) at all. HRI I, 198 F.3d at 1254 (quoting Cheyenne Arapaho Tribes v. Okla., 618 F.2d 665, 668 (10th Cir.1980)). The majority therefore has not cited to a single court of appeals case after Venetie that rejects a community-of-reference approach to determining the existence of a dependent Indian community.
The majority states that it is “unclear how these courts could have conducted a proper § 1151(b) analysis without” the community of reference test if that is an essential threshold test. Maj. op. at 1165 n.29. But neither case presented a situation where such a threshold test was required, and thus the holdings of those cases necessarily say nothing about the propriety of such a test. I cannot agree with the inference drawn by the majority that, by omitting any mention of a community-of-reference test, those courts must have precluded the application of such a test.
The majority also cites to a decision by the New Mexico Supreme Court which does directly address the community-of-reference test and concludes that the test does not apply. See, State v. Frank, 132 N.M. 544, 52 P.3d 404, 409 (2002) (“In light of the clear guidelines in the Venetie opinion, we decline to incorporate a community of reference inquiry into our case law.”). However, that court may have misinterpreted our community-of-reference test as comprising some of the balancing factors disapproved by Venetie rather than simply as an effort to determine the appropriate community of reference in § 1151(b) to which to apply the Venetie test. See id. at 409. Further, the court in Frank did not directly address the arguments advanced here, including the statutory interpretation and policy arguments, and that Venetie addressed a factual situation that did not involve consideration of the appropriate community of reference.
In addition, four years later, the New Mexico Supreme Court appeared to qualify Frank’s holding by recognizing that “the fee land within a § 1151(b) dependent Indian community is Indian country just like the fee land within a § 1151(a) reservation.” State v. Romero, 140 N.M. 299, 142 P.3d 887, 895 (2006). Admittedly, the land at issue in Rom,ero was within a pueblo. Nevertheless, the court endorsed a larger community approach to determining whether privately-owned fee land within the pueblo is a dependent Indian community, and it rejected the argument “that we should look only to the parcels of private fee land, rather than the whole pueblo.” Id. at 892. The court further noted that “[cjonsidering the pueblo as a whole is also consistent with congressional intent in enacting § 1151 because it discourages checkerboarding,” id., which, of course, is one of the primary arguments for retaining the community-of-reference analysis in § 1151(b) as introduced in Watchman. Thus, the New Mexico Supreme Court treated all of the land within the pueblo, including privately-held land, as the “land in question” for purposes of applying the Venetie factors. Id. Accordingly, the New *1179 Mexico Supreme Court recognizes that land within a dependent Indian community can be Indian country under § 1151 even though the specific parcel of land at issue is privately-owned in fee by non-Indians.
This New Mexico case law is therefore not particularly illuminating, both because “we [are not] bound by a state court’s interpretation of federal law,” Wilder v. Turner, 490 F.3d 810, 814 (10th Cir.2007), and because, in light of Romero, it is not clear that the holding of Frank is still valid even in New Mexico courts.
D. Application to Section 8
1. Community of reference
Therefore, I conclude that a court considering whether a piece of land constitutes a dependent Indian community under 18 U.S.C. § 1151(b) should engage in a two-step process. First, when the area proposed as a community is disputed, the eourt must determine the appropriate community of reference. Second, the court must apply the two Venetie factors to that community to determine whether that community is dependent and Indian. The community will thus constitute a dependent Indian community only if it was set aside for the use of the Indians and is under the superintendence of the federal government. Venetie, 522 U.S. at 531-32, 118 S.Ct. 948.
Determining the appropriate community of reference requires three steps. First, the court (or agency) must determine whether the proposed community has reasonably ascertainable boundaries. See Adair, 111 F.3d 770, 774 (10th Cir.1997); see also Cohen (1982), Ch. 1 § D3c, at 39 (“[T]he statute intended to include only Indian communities with reasonably defined boundaries.... ”). Next, the court must determine whether the land within those boundaries possesses a reasonable degree of coherence such that the land is logically treated as a community. Finally, the court should look at whether the uses to which the land is put and the people inhabiting the land possess a reasonable degree of coherence. If the area of land has reasonably ascertainable boundaries and the land possesses a reasonable degree of cohesiveness, then it is an appropriate community for the purpose of determining whether it is a dependent Indian community under 18 U.S.C. § 1151.
As articulated above, community, as used in § 1151(b), implies context. While Venetie did not address how to determine the appropriate community of reference, it did make clear that the status of the land within the alleged community plays an important role in determining whether the land is part of a dependent Indian community. See Venetie, 522 U.S. at 530 n. 5, 118 S.Ct. 948. Therefore, I initially consider the extent to which the land itself shares common features.
First, the hydrology of the Section 8 land is directly tied into the hydrology of the entire Church Rock Chapter. Three separate aquifers—the Westwater Canyon Aquifer, the Cow Springs Aquifer, and the Dakota Sandstone Aquifer—all ran directly underneath the Section 8 land and throughout the Chapter. As of 1998, fourteen wells from the Westwater Canyon Aquifer—from which the Chapter residents predominately draw their drinking water—were within twenty miles of Section 8. The water from those wells meets primary SDWA standards, and the Branch Manager of the Water Management Branch of the Navajo Nation Department of Water Resources characterized the Westwater Canyon water as “outstanding.” (R. doc. 13b at 252.) This common hydrology throughout the Chapter makes it difficult for any activities that affect the groundwater carried out on Section 8 land to be limited to that parcel. (R. doc. 40 at B-3 (“Westwater Canyon ... has some of *1180 the area’s groundwater and most of its uranium deposits.”).) Rather, any pollution into the aquifers would likely affect much of the Chapter population.
In addition, the land throughout the Church Rock Chapter is connected based on its history and usage. Cf. Venetie, 522 U.S. at 523-24, 118 S.Ct. 948 (discussing history of the Neets’aii Gwich’in lands). The land in the Church Rock Chapter is predominately devoted to livestock grazing; in fact, the portion of HRI-owned land within Section 8 is surrounded on all four sides by grazing land used by members of the Chapter. Grazing exists on Section 8 land, pursuant to BIA-issued grazing permits, in a manner that is integrated with the surrounding areas of the Chapter. For instance, Grazing Permit Number 7 contiguously covers over half of Section 8, all of Section 9, and half of Section 16, as well as a portion of Section 17; Grazing Permit Number 8 also covers part of Section 8, and extends south into Section 17. This demonstrates that Section 8’s land is in no way distinct from the lands surrounding it and it is fully integrated in the land’s history of supporting a livestock-based economy. From the standpoint of the characteristics of the land, then, Section 8 is part of the community of land in the Church Rock Chapter.
Although Venetie emphasized the importance of considering the land, it did not foreclose consideration of other factors for purposes of determining the community of reference. Indeed, while the word “community” can refer to the area in which a well-defined group of people lives, the word also refers to the group of people themselves. See Webster’s Third New International Dictionary 460 (1986) (defining community as “a body of individuals organized into a unit or manifesting [usually] with awareness some unifying trait”). Consideration of the people who live within the Church Rock Chapter further shows that the Chapter is properly considered a single community. Based on the 2000 census, 97.7% of the 2,802 residents of the Chapter are Indian, and most of the remaining sixty-five residents are married to Navajos. A majority of the residents speak Navajo. In addition to a common heritage, residents of Church Rock remain closely tied to the Chapter. 88% of the residents of Church Rock go to the Chapter House at least monthly, further underscoring the sense of community throughout the Chapter. Finally, through the Chapter House, the residents receive a variety of services, including a Head Start program, community health care, housing assistance, work programs, utility line extensions, and a food distribution center.
Therefore, on the basis of these various indicators, I would conclude that the Church Rock Chapter, rather than Section 8 itself, is the appropriate community of reference. This analysis gives effect to the intent of Congress embodied in § 1151 to avoid checkerboard jurisdiction. See Seymour, 368 U.S. at 358, 82 S.Ct. 424 (stating that Congress intended to avoid “an impractical pattern of checkerboard jurisdiction ... by the plain language of § 1151”). “[T]he full statute was intended to reduce earlier difficulties which had arisen from the ‘checkerboarding’ of land ownership and rights-of-way.” Cohen (1982), Ch. 1 § D3c, at 39. Consideration of whether a community qua community, rather than an individual tract of land, is Indian country gives meaning to the word “communities” in the statute, and limits the undesirable outcome where jurisdiction changes every mile.
The unfortunate consequences of the majority’s opinion are made especially clear by the facts of this case. HRI seeks to operate a mine on portions of Section 8 and the adjoining Section 17. As Section 17 is trust land, however, it is unquestion *1181 ably Indian country under 18 U.S.C. § 1151(a) and subject to EPA’s jurisdiction for SDWA purposes. Now, under the majority’s opinion, passing the invisible boundary between Section 17 and 8 transfers jurisdiction from EPA to NMED, despite the continuous mining operation and the shared aquifer between the two parcels (as well as the rest of the Chapter). Section 1151 sought to avoid such a jurisdiction-by-tract-book approach in the realm of criminal jurisdiction, and the EPA reasonably adopted the same standard to apply for purposes of SDWA jurisdiction.
The majority’s extended discussion of the difficulties that would arise in administering a community-of-reference test overlooks one simple fact: community-of-reference has been the law in this circuit for the last twenty years. Outside of some eon-clusory and unsupported assertions offered by the states in their amicus brief, the parties have not called to our attention any significant problems that this test has caused. To the contrary, it is the majority that is casting off into uncharted waters, and while the community-of-reference test has caused no significant difficulties of which I am aware, the real-world implications of the majority’s new approach are, quite frankly, unknown. Indeed, the relatively few cases seen by this court over the last two decades concerning confusion over the appropriate community of reference is strong circumstantial evidence that the test in fact works well.
2. The Venetie factors
Having established Church Rock Chapter as the appropriate community of reference, I would then apply Venetie’s set-aside and superintendence requirements to determine if the Chapter constitutes a dependent Indian community. Upon examination, both requirements are easily met.
In order for a community to satisfy the set-aside requirement, “the Federal Government must take some action setting apart the land for the use of the Indians ‘as such.’ ” Venetie, 522 U.S. at 530 n. 5, 118 S.Ct. 948.; id. at 531 n. 6, 118 S.Ct. 948 (“The federal set-aside requirement also reflects the fact that ... some explicit action by Congress (or the Executive ...) must be taken to create or to recognize Indian country.”). Here, the government purchased several parcels in the area from the Santa Fe Pacific Railroad Company in the late 1920s. See HRI II, 562 F.3d at 1254 n. 3. The government placed much of that land in trust for the Navajos and allotted the rest to individual Navajos. Id. at 1252. The government has set aside 78% of the land in the Chapter for the use of Indians either as trust land either for the tribe or for individuals in the form of allotments, and BLM owns an additional 10% of the land, for which grazing permits are granted to Navajos. Considering the Chapter as the community, then, the Chapter has been set aside by the federal government for the use of the Navajo.
The Chapter also satisfies the federal superintendence requirement. “Superintendency over the land requires the active involvement of the federal government.” Buzzard, 992 F.2d at 1076; see also Venetie, 522 U.S. at 533, 118 S.Ct. 948 (noting that, in past cases that found federal superintendence, “the Federal Government actively controlled the lands in question, effectively acting as a guardian for the Indians”). In McGowan, for example, the Court found superintendence where the federal government “retains title to the lands which it permits the Indians to occupy” and where the federal government “has authority to enact regulations and protective laws respecting this territory.” 302 U.S. at 539, 58 S.Ct. 286; see also United States v. Roberts, 185 F.3d 1125, 1132-33 (10th Cir.1999); Buzzard, 992 F.2d at 1076.
*1182 In the form of tribal trust land, allotments, or land owned by BLM, the federal government retains title to 92% of the land in the Chapter, and as title owner certainly retains superintendence over the land. In addition, EPA found that DOI supervises natural resources in the Chapter, and BIA supervises land use, issues glazing permits, “protect[s] Navajo Nation trust lands, natural resources, and water rights, and administers] various trust benefits on behalf’ of the Chapter. (R. doc. 44 at 12.) Thus, not only does the federal government possess “authority to enact regulations and protective laws” in the Chapter, it frequently acts on that authority. McGowan, 302 U.S. at 539, 58 S.Ct. 286. Indeed, as the Navajo Nation noted, “[tjhere is no significant difference in the way the United States interacts with the Church Rock Chapter [and] the way it interacts with Chapters located in the Navajo Reservation proper,” and reservations are under federal superintendence. (R. doc. 13a at 13.) The Chapter therefore is under federal superintendence.
III. Conclusion
In my view, the Church Rock Chapter is the appropriate community of reference. As the Chapter satisfies both of the criteria identified in Venetie, I would conclude that HRI’s Section 8 land is within a dependent Indian community and affirm the panel’s decision.
The lengthy opinions generated by this case and the division within this court as to the proper interpretation of 18 U.S.C. § 1151(b) attest to the confusion surrounding this area of the law. This confusion is unfortunate, and the consequences are likely to be enormous, reintroducing checkerboard jurisdiction into the southwest on a grand scale and disrupting a field of law that had been settled for decades. In overturning our community-of-reference test, the majority today reaches a result not compelled by either Supreme Court or Tenth Circuit precedent. Before all is said and done, this confusion and the serious consequences generated by today’s opinion may ultimately require resolution by the Supreme Court.

. These figures do not add up exactly to 100%, and the record reflects some confusion as to the precise acreages of land owned by these different entities. Nonetheless, the various estimates provided in the record are all relatively close to one another, within 2.4%. I have cited the estimates used by EPA in its Determination, and neither party challenges the substantive accuracy of these numbers.

. I agree with the majority that EPA's Determination is not entitled to deference under Chevron, U.S.A., Inc. v. Nat’l Res. Def. Council Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). I would, however, afford the Determination deference under Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Skidmore deference is a lesser form of deference in which "the weight to be given the agency’s practice in particular circumstances depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.’" McGraw v. Barnhart, 450 F.3d 493, 501 (10th Cir.2006) (quoting Skidmore, 323 U.S. at 140, 65 S.Ct. 161). Based on these factors, 1 would defer to EPA’s Determination to a degree "proportional to its ‘power to persuade.’ ” United States v. Mead Corp., 533 U.S. 218, 235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (quoting Skidmore, 323 U.S. at 140, 65 S.Ct. 161).
The majority slates that it is "inappropriate” to consider whether the EPA’s Determination warrants Skidmore deference because EPA has not asked for such deference. However, "[a] party's concession on the standard of review does not bind the court, as ‘such a determination remains for the court to make for itself.' ” United States v. Bain, 586 F.3d 634, 639 n. 4 (8th Cir.2009) (quoting K & T Enter., Inc. v. Zurich Ins. Co., 97 F.3d 171, 175 (6th Cir.1996)); see also Worth v. Tyer, 276 F.3d 249, 262 n. 4 (7th Cir.2001); Izzarelli v. Rexene Prods. Co., 24 F.3d 1506, 1519 n. 24 (5th Cir.1994); cf. Gardner v. Galetka, 568 F.3d 862, 879 (10th Cir.2009) (concluding that AEDPA’s standard of review cannot be waived).

. The majority claims that its inquiry is solely into whether the specific parcel of land at issue is both set aside for Indian use and federally superintended, and thus does not focus on title at all. Maj. op. at 1151 n.12. However, it is difficult to imagine a situation in which a piece of property owned in fee by a private individual, examined in isolation from the community in which the parcel of land is located, could meet these two criteria. In fact, HRI conceded at oral argument that, under its reading of § 1151(b), the inquiry is solely into who owns the land in fee. (Oral Argument Recording at 15:55 to 16:10.) In support of its dubious claim that title is not determinative under its § 1151 (b) test, the majority cites to a note accompanying 25 U.S.C. § 331, which explicitly extends federal and tribal criminal jurisdiction to certain acts committed “anywhere within the external boundaries of a pueblo." But this citation to a note accompanying 25 U.S.C. § 331 is simply irrelevant to determining the proper construction of a phrase in 18 U.S.C. § 1151(b). However the majority chooses to frame it, a determination that land is privately held in fee will necessarily foreclose the possibility that the land is part of a dependent Indian community.

. Section 1156, prohibiting the unlawful possession of intoxicating liquors in Indian country, also contains this definition of "Indian country.” 18 U.S.C. § 1156.

. In Venetie, the Supreme Court did not criticize, or even refer to, Mazurie, and so the approach adopted by the Court in Mazurie remains valid.

. Sections 1151, 1154, and 1156 were all enacted together in 1948 as part of the Indian Major Crimes Act, and the "non-Indian communities” language was added to sections 1154 and 1156 the following year. Indian Major Crimes Act, ch. 645, 62 Stat. 757-59 (1948); Act of May 24, 1949, ch. 139, 63 Stat. 94. This statutory history supports interpreting these statutes together. See Watchman, 52 F.3d at 1544 n. 13 (“The courts have looked to non-Indian community cases and dependent Indian community cases when addressing either issue.").
As mentioned above, the majority cites to a statute enacted in 2005 that unambiguously provides for federal and tribal criminal jurisdiction in certain instances within the exterior boundaries of a pueblo as proof that § 1151(b) did not already extend jurisdiction to such lands. Maj. op. at 1156 (citing 25 U.S.C. § 331 Note). To the extent a statute passed in 2005 has any significance to this court's interpretation of a statute passed in 1948, however, it shows only that Congress wanted to unambiguously extend federal and tribal jurisdiction within pueblos rather than rely on the contested interpretation of § 1151(b). Accordingly, I consider the code provisions passed contemporaneously with § 1151 and that courts have consistently interpreted as interrelated with § 1151, see Watchman 52 F.3d at 1544 n. 13, to be more instructive to the meaning of § 1151 than a bill passed five years ago and codified in a different title of the United States Code.

. There was one exception to the revocation of the reserves, see 43 U.S.C. § 1618(a), but that exception was not relevant to the issue in Venetie.